**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

ANDRE WAUL,

                                    Plaintiff,

        v.                                                    No. 05-CV-24
                                                                    (DNH/DRH)

JOHN E. CUNNINGHAM, JR., M.D.; STEVEN
VAN BUREN, Regional Health Service Adm.;
RODD KOCH, Physical Therapist; MICHAEL
ANUSZEWSKI, Physical Therapist; DANNY
PREOCANIN, Physical Therapist; VINCENT
MENYA, Physical Therapist; TIMOTHY
WHALEN, M.D.; MITCHELL RUBINOVICH,
M.D.; COREY, Corrections Sergeant; BAILEY,
Corrections Officer; MARGE BYRNES,
Regional Health Services Administrator; E.
SOTILE, Facilities Health Services Director,
Fishkill Correctional Facility; I. ASSEFI, M.D.;
and DELESSIO, Physical Therapist,

                                    Defendants.

_____

**APPEARANCES:**                              **OF COUNSEL:**

ANDRE WAUL
No. 78-A-2915
Plaintiff Pro Se
Fishkill Correctional Facility
Post Office Box 1245
Beacon, New York 12508

HON. ANDREW M. CUOMO                  CHRISTINA L. ROBERTS-RYBA, ESQ.
Attorney General for the             Assistant Attorney General
  State of New York
Attorney for State Defendants
The Capitol
Albany, New York 12224-0341

ROEMER WALLENS & MINEAUX, LLP        MATTHEW J. KELLY, ESQ.
Attorneys for Defendants Koch,
    Anuszewski, & Preocanin
13 Columbia Circle
Albany, New York 12203

**DAVID R. HOMER**
**U.S. MAGISTRATE JUDGE**

### REPORT-RECOMMENDATION AND ORDER[1]

Plaintiff pro se Andre Waul ("Waul"), an inmate in the custody of the New York State Department of Correctional Services ("DOCS"), brings this action pursuant to 42 U.S.C. § 1983 alleging that the fourteen defendants violated his constitutional rights under the Eighth Amendment.[2]  Am. Compl. (Docket No. 98).  Presently pending are two motions for summary judgment pursuant to Fed. R. Civ. P. 56.  Docket Nos. 153 (defendants Koch, Anuszewski, and Preocanin), 161 (State defendants).[3]  Waul opposed the motions.  Docket Nos. 167, 170-72, 176, 178.  For the following reasons, it is recommended that both motions be granted.

### I. Background[4]

The facts are related in the light most favorable to Waul as the non-moving party. See subsection II(A) infra. Those facts are related in detail in light of the issues raised by defendants' motions.

---

[1] This matter was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

[2] Two other defendants were previously dismissed from the action.  Docket No. 61.

[3] The two motions raise identical issues and will be considered together.

[4] Waul's medical records were filed in pard copy rather than electronically.  Docket No. 161.  Those records will be referenced herein as "Docket No. 161, Ex. A." Additionally, a file containing physical therapy treatment notes from June 2004 to December 2006 was also filed and will be referenced herein as "Defs. Mem. dated 7/21/2008."

## A. Physical Therapy

### 1. October 1999 - February 2000

On October 6, 1999, after complaining of severe pain from a chronic right knee injury, Waul was taken to the Coxsackie Regional Medical Unit ("RMU") and examined by Dr. Das.  Am. Compl. at ¶¶ 19-20.  An MRI revealed a torn anterior cruciate ligament ("ACL"), a partially torn post cruciate ligament ("PCL"), and a torn meniscus.  Docket No. 167-3 at 4.  Waul was scheduled for surgery to repair his torn ligaments and meniscus.  Id. at 6-7.  Prior to surgery, on or about November 4, 1999, Waul broke the patella in his left knee.  Am. Compl. at ¶ 21; Docket No. 167-3 at 7.  On November 9, Dr. Das performed surgery on Waul to treat the ACL tear and broken patella.  Koch Aff. (Docket No. 153-12) ¶ 4; Waul Dep. (Docket Nos. 153-5, 161-3) at 20; Assefi Decl. (Docket No. 161-6) ¶ 9; Delessio Decl. (Docket No. 161-10) ¶ 9; Whalen Decl. (Docket No. 161-12) ¶ 7.

Shortly thereafter, Dr. Das examined Waul and observed that Waul was doing well, with minimal swelling and almost full extension of his knee, but cautioned that Waul needed to begin physical therapy immediately.  Docket Nos. 153-8 at 2, 167-3 at 8.  Dr. Das also provided defendant Koch,[5] a physical therapist, with a protocol for Waul's rehabilitation.[6] Koch Aff. ¶ 7; see also Waul Dep. at 25; Docket No. 153-12 at 7-9.  Such directions from an orthopaedic surgeon served as a guideline for rehabilitation.  Koch Aff.  ¶¶ 7-8; Delessio Decl. ¶ 10; see also Sottile Decl. (Docket No. 161-8) ¶¶ 14, 19.

---

[5] Koch provided physical therapy to Waul at RMU in 1999 and 2000.  Koch Aff. ¶ 2.

[6] The physical therapists were unable to authorize the purchase additional therapy equipment for correctional facilities, but each facility offered adequate equipment to perform the exercises indicated in Waul's treatment plan.  Anuszewski Aff. ¶¶ 14-15; Delessio Decl. ¶¶ 16-18; Koch Aff. ¶¶ 9-10, 15.

Over the next few weeks, Waul was taken to RMU several times for physical therapy, performed strengthening exercises on his own after therapy, made progress, but still suffered from "significant atrophy in the quad."  Docket Nos. 153-8 at 3, 167-3 at 16.  On November 29, 1999, Dr. Das recommended continued strengthening of Waul's quadriceps, range of motion, and use of polar care, a knee brace which circulated cold water to decrease swelling after therapy and as needed.  Docket Nos. 153-8 at 3, 167-3 at 16.

In December, Waul attended six physical therapy sessions at RMU.  Docket Nos. 153-6 at 2-7, 153-7 at 5.[7]  During these treatments (1) Waul stated that his knee was improving, (2) therapy notes indicated that Waul had no difficulty complying with his home exercise program outside of therapy, (3) Waul performed multiple sets and multiple repetitions of exercises for his quadriceps and hamstrings using various levels of resistance, (4) Waul received electric stimulation treatment for his muscles on five occasions, (5) treatment notes indicated that Waul was doing well with treatment, and (6) treatment notes indicated that the therapist twice requested that Waul be permitted to use Thera-Band[8] to complete exercises outside of therapy and once requested provision of a

---

[7] Waul's ambulatory health records indicate that from December 1999 until September 2000, he went to approximately thirty-four therapy sessions, returning from at least twenty-nine with no complaints of pain to the medical staff.  Docket No. 161, Ex. A at 174-214.  Additionally, the records show that staff provided over-the-counter pain relievers at least eight times, arranging for or taking Waul to at least three orthopaedic consults, noting at least six instances where sick calls dealt with Waul's knee problems, and three instances where the utility of ice was discussed or it was requested.  Id.  Additionally, Waul did not attend at least seven appointments, at least one of which was specifically for physical therapy.

[8] Thera-Band manufactures a variety of exercise products used in physical therapy principally including large bands that provide resistance when stretched.  See Thera-Band website (visited Mar. 12, 2009) <http://www.thera-band.com>.  Throughout the record, multiple requests for Thera-Band are made on Waul's behalf.  See generally Koch Aff. ¶ 14.  Each correctional facility had different rules concerning such items as they presented

new knee brace.  Docket Nos. 153-6 at 2-7, 153-7 at 5.

In January 2000, Waul received his last two sessions of therapy.  It was noted that (1) Waul's knee was doing well, (2) the knee's range of motion and strength were normal, and (3) Waul was performing quadriceps and hamstring strengthening exercises for greater numbers of repetitions and with increased weight.  Docket No. 153-6 at 8-9.  On January 24, 2000, Dr. Das found that Waul was doing extremely well with full range of motion in his knee as well as "some continued quad atrophy."  Docket Nos. 153-8 at 4, 167-3 at 36, 167-3 at 37 (ambulatory health record indicating that Waul was doing well after his ACL repair).  Dr. Das recommended "more aggressive quad strengthening and continued therapy ]twice] a week over the next month," instructing the therapists to advance with the suggested protocol and incorporate a stationary bicycle or treadmill into the sessions.  Docket Nos. 153-8 at 4, 167-3 at 36.

On February 2, 2000, Waul received a response letter from defendant Cunningham regarding his complaints about the therapy he was receiving.  Docket Nos. 161-9 at 5, 167-3 at 35; Cunningham Decl. (Docket No. 161-9) ¶ 15; see also Docket No. 167-3 at 33-34 (Waul's letter to Cr. Cunningham).  Dr. Cunningham explained that Waul's worries were resolved as his current needs for therapy indicated that he was receiving adequate treatment and that his physical therapy eligibility had been extended.  Docket Nos. 161-9 at 5, 167-3 at 35; Cunningham Decl. ¶¶ 11-14.

---

concerns for safety and security, some allowing them in cells and others only in medical areas under supervision.  Id.  That decision was made by the correctional facility and not the therapist.  Id.

**2. February - June, 2000**

In February 2000, Waul received six physical therapy sessions at Shawangunk

Correctional Facility ("Shawangunk").[9]  Docket Nos. 153-6 at 10-15, 153-7 at 2-4, 167-3 at

38.  Defendant Aneszewski, the attending physical therapist, noted that Waul had already

received two months of therapy and was scheduled for continued therapy twice a week

focusing on strength and mobility exercises.  Aneszewski Aff. (Docket No. 153-11) ¶¶ 5-6.

During therapy, (1) Waul rode the exercise bicycle for a minimum of ten minutes

progressing to a maximum of twenty minute sessions; (2) Waul utilized the stair stepper

frequently progressing from two minutes to eight minutes during the month; (3) Waul's

sessions lasted between thirty and fifty minutes; (4) Waul stated that his knees felt better,

he was progressing well, and he had no complaints about treatment; and (5) Waul

continued home therapy as directed.  Docket Nos. 153-6 at 10-15, 153-7 at 2-4; 167-3 at

38.

On February 11, 2000, Waul received a response from Dr. Lester Wright regarding

the medical treatment Waul was being provided.  Docket No. 167-3 at 29.  The letter

indicated that Waul had attended therapy sessions since his surgery and that more had

been approved and scheduled.  Thus, Waul's concerns were unfounded.  Id.  Of the

sessions Waul received in February, three occurred after Dr. Wright's letter.  Docket No.

153-6 13-15, 167-3 at 38.  On February 14, 2000, Waul stated that "his knees [felt] fine and

they [were] coming along well."  Aneszewski Aff. ¶ 8; Docket No. 153-6 at 13.

On March 22, 2000, Waul was examined by Dr. Quinn, an orthopaedist, for a follow-

---

[9] From February to May 2000, defendant Anuszewski conducted physical therapy at
both Shawangunk and RMU.  Anuszewski Aff. (Docket No. 153-11) ¶ 3.

up appointment for his ACL repair surgery.  Docket No. 153-6 at 64.  Dr. Quinn noted that Waul had constant pain in his knee and recommended more sessions of physical therapy for both knees because Waul required further quad strengthening.  Id.  On March 31, 2000, Waul was treated by Anuszewski at RMU.  Docket No. 153-6 at 16.  Waul had been exercising on his own everyday and had no complaints of pain but stated that he was becoming weaker.  Id.; see also Anuszewski Aff. ¶ 9.  Anuszewski reissued Thera-Band to Waul and noted that he "exhibit[ed] less objective deficits th[a]n he [complains of] subjectively [and] should not need [eight weeks] of [physical therapy]."  Id.; Docket No. 153-6 at 16.  Anuszewski noted that many patients needed physical therapy after surgery and were unable to make a full recovery.  Anuszewski Aff. ¶ 11; see also Koch Aff. ¶ 17; Delessio Decl. ¶ 19.  Patients were discharged from therapy when (1) they had met their goals, or (2) they were no longer progressing, thus underscoring the importance of a home exercise program.  Id.  ¶¶ 12-13.[10]

In April 2000, Waul received two physical therapy sessions at RMU and two at Shawangunk.  Docket No. 153-6 at 17-19, 40, 167-3 at 39.  During the sessions at RMU, Waul indicated that his legs would shake when he did certain exercises and that he was unable to perform his exercises in his cell because he had no room to execute the motions properly.  Docket Nos. 153-6 at 17 & 40, 167-3 at 39.  Additionally, Waul received fifteen minutes of bilateral lower extremity stretching, Waul biked for ten minutes, Waul engaged in three sets of weighted leg exercises, his strength and endurance had improved, and the

---

[10] From experience in the private sector, Anuszewski knows that private insurance companies generally terminate coverage for therapy after twenty sessions regardless of the patient's progress.  Anuszewski Aff. ¶ 14.  Waul received substantially more than twenty therapy sessions.  Id.

therapist emphasized the importance of engaging in additional exercises on his own.
Docket Nos. 153-6 at 17 & 40, 167-3 at 39.  At Shawangunk, Waul stretched, iced his knee,
used the stair stepper and bicycle, and performed other exercises with resistance during his
sessions.  Waul's subjective complaints continued despite his objective improvements in
strength and endurance.  Waul indicated that he was no longer performing his home
exercise regiment due to his inability to receive Thera-Band or weights from the facility.
Docket No. 153-6 at 18-19.

On April 21, 2000, Waul received a response to his complaints regarding his inability
to perform his home exercise program which stated that Waul could use a bench in the
hallway to complete his exercises properly.  Docket No. 167-6 at 17.  Additionally, despite
Waul's continued contentions that every other rehabilitation facility was inferior to RMU, his
treatment notes indicated that there was no need for Waul to go to RMU as his needs could
be properly addressed at other rehabilitation locations.  Id.

In May, Waul received an additional seven therapy sessions.  Docket Nos. 153-6 at
20-26, 167-3 at 49.  On May 1, 2000, Waul complained of increased pain and swelling in
his knee and reported using a crutch and knee brace to assist with ambulation.  Docket No.
153-6 at 20.  Waul's therapy consisted of twenty wall sits, thirty step-ups, and twenty
squats.  Id.  The duration and intensity of the therapy was curtailed by Waul's complaints of
pain.  Id.  Three days later, Waul returned with fewer complaints of knee discomfort.  Id. at
21.  Waul also disclosed that he had not been exercising on his own since he lacked
appropriate equipment, but, the therapist recommended simple alternatives that did not
require equipment.  Id.  Therapy notes indicate eight different exercises which Waul
performed in addition to riding the bicycle for twenty minutes.  Id.  Waul did well with

treatment and was again instructed in alternate ways to perform his home therapy exercises.  Id.

During the next four physical therapy sessions, Waul stated that his knee continued to improve with only occasional swelling.  The same eight exercises were performed in three sets of fifteen repetitions and Waul continued to ride the bicycle for twenty minutes per session.  As Waul increased exercising on his own, his knee's strength, range of motion, stability, and endurance improved.  Docket No. 153-6 at 22-25.  On May 24, 2000, Dr. Das found no swelling in Waul's knee, noted atrophy in his quadriceps, and recommended continued physical therapy and a new knee brace.  Docket No. 167-3 at 49.  On May 25. 2000, Waul showed improvement and little swelling in his knee.  Docket No. 153-6 at 26.

Waul received his final therapy session at Shawangunk on June 1, 2000.  Docket Nos. 153-6 at 27, 167-3 at 50.  Waul voiced no complaints of pain or discomfort, continued his previous exercises, and showed further improvement.  Docket Nos. 153-6 at 27, 167-3 at 50.  On June 12, 2000, Waul was discharged from physical therapy by RMU because, although still complaining that his knees bothered him intermittently, Waul was doing well overall, was independently completing exercise programs, was managing any resulting swelling, and exhibited normal ranges of motion and strength in both knees.  Docket Nos. 153-6 at 28. 167-3 at 51; Koch Aff. ¶ 12.


### 3. July 2000 - December2001

On July 5, 2000, Waul was examined by Koch for continued complaints of knee pain.  Docket Nos. 153-6 at 29, 167-3 at 56; Koch Aff. ¶ 13.  Waul's knee pain had begun a few

days earlier, but upon examination, Waul exhibited no swelling, had normal range of motion and strength in both knees, and could complete his home exercises independently.  Docket Nos. 153-6 at 29, 167-3 at 56; Koch Aff. ¶ 13.  Koch restated that Waul should be discharged from therapy for the reasons stated above but that he should be granted continued use of the facility for completing his independent exercise program.  Docket Nos. 153-6 at 29, 167-3 at 56; Koch Aff. ¶ 13.[11]

Waul was housed intermittently at Bare Hill Correctional Facility ("Bare Hill") from August 2, 2000 through April 12, 2004.  Whalen Decl. (Docket No. 161-12) ¶ 6; Waul Dep. at 29.[12]  In September 2000, Waul began physical therapy at Franklin Correctional Facility ("Franklin") with complaining of pain in his right knee.[13]  Docket No. 153-6 at 30.  The initial assessment noted that therapy might be difficult since Waul now exhibited pain in his left knee as well.  Id.  Waul was evaluated by defendant Dr. Mitchell Rubinovich on September 28, 2000 who found that Waul "did not get quite all the [physical therapy] he need[ed] and although he has a good range and good stability, he is missing quite a bit of quad strength."  Docket No. 161-13 at 6.; see also Rubinovich Decl. (Docket No. 161-13) ¶ 8.  Dr. Rubinovich recommended additional rehabilitation but stated that he thought Waul was "doing well" considering.  Docket No. 161-13 at 6; Rubinovich Decl. ¶ 9.

_____

[11] Koch maintains that his discharge of Waul from therapy was justified by Waul's he had normal strength and range of motion within six months of surgery, his complaints lacked objective support, and his complaints could have been resulted from Waul's failure to exercise in independently.  Koch Aff. ¶ 18.

[12] Bare Hill inmates were sent to either Franklin, Upstate, or Clinton Correctional Facilities for physical therapy services.  Waul Dep. at 34-35.

[13] From September 2000 until January 2002, Waul requested over-the-counter pain medication only four times, one request for physical therapy, one for a knee brace, and two orthopaedic consults.  Docket No. 161, Ex. A at 134-175.

In November 2000, Waul received four physical therapy sessions at Upstate Correctional Facility ("Upstate").  Docket No. 153-6 at 31-34.  Waul's knee was painful and swollen.  Id.  During these sessions, Waul used the bicycle and performed squats, lunges, and knee extensions with weight.  Id.  Additionally, the therapist recommended that Waul be fitted with orthotics and a new knee brace and be authorized to ice his knee.  Id. at 31-32.  On December 13, 2000, Waul attended physical therapy at Clinton Correctional Facility ("Clinton") performing identical exercises.  Id. at 35.

On March 27, 2001, Waul returned to physical therapy at Franklin, where he received the remainder of his physical therapy treatments.  Docket No. 153-6 at 36.  Waul was examined twice in March for pain in both knees but tolerated cycling, single leg squats, lunges, and weighted knee extensions.  Id. at 36-37.  In April, Waul received six sessions of therapy complaining of bilateral knee pain and occasional complaints of discomfort from his knee brace.  Docket No. 153-6 at 38-39, 41-44.  In the first three and last sessions of the month, Waul bicycled and performed single leg squats, lunges, and weighted knee extensions.  Id. at 38-39, 41, 44.  The middle two treatments focused on stretching, electric stimulation of the muscles, and other exercises.  Id. at 42-43.  Waul tolerated the treatment, but it was recommended that he be provided a new knee brace which was better fitted and would not interfere with his gait.  Id. at 38-39, 41-44.

In May 2001, Waul received another three therapy sessions and showed continued pain in his left knee at each, but the therapist insisted that Waul continue to exercise independently.  Docket No. 153-6 at 45-47.  Waul's therapy included electric stimulation to strengthen weak muscles, cycling, and other resistance exercises.  Id.  While Waul tolerated treatment, on May 28, 2001, the therapist noted the need for "more continuous

11

therapy for any benefit to [result with] his knee[s]" and an orthopaedic consultation  Id. at 45; see also Docket No. 167-4 at 19.

Waul received another four therapy sessions in June 2001 despite continual complaints of pain in his left knee.  Docket Nos. 153-6 at 48-51, 167-4 at 18.  Therapy included stretching and isometric exercises, cycling, resistance exercises, squats, and electric stimulation.   Docket Nos. 153-6 at 48-51, 167-4 at 18.  The next four treatment sessions in July were identical.  Docket Nos. 153-6 at 52-55, 167-4 at 20.  Additionally, on July 5, 2001 Dr. Rubinovich observed that in February, he had crafted a new ACL brace, and, despite multiple fittings over the last six months, the hinge alignments were incorrect. Docket Nos. 161-13 at 8, 167-4 at 19.  Dr. Rubinovich requested that Waul be provided a Don-Joy brace.  Docket Nos. 161-13 at 8, 167-4 at 19; Rubinovich Decl. ¶ 11.

On July 25, 2001, with a different physical therapist.  Waul complained of pain and performed exercises and received electric stimulation and ice for his muscles and knee. Docket No. 153-6 at 56-58.  By August 22, 2001, although Waul still experiencing pain in his knee, he stated that things were going well and continued with the stretching exercises, bilateral Thera-Band strengthening exercises, cycling, and ice.  Id. at 59.  At the next session, Waul felt stronger and the therapy included stretching, cycling, slides, Thera-Band and weight strengthening exercises, and electric stimulation.  Id. at 60.  The following four sessions showed improvement in range of motion and strength although Waul continued to complain of pain.  Id. at 61-63; Docket No. 167-4 at 21-22.  Exercises included thirty minutes of the prior strengthening exercises, fifteen minutes of electric stimulation, and review on the independent home exercise program.  Docket Nos. 153-6 at 61-63, 167-4 at 21-22.

On September 28, 2001, Waul received his new knee brace.  Docket No. 167-4 at 23.  On November 1, 2001, Waul received his final physical therapy session which consisted of thirty minutes of his prior exercise regime, electric stimulation, and instruction with the independent exercise program as well the conclusion that Waul had a "good response to [physical therapy]."  Docket No. 167-4 at 24.  From December 1999 to November 1, 2001, Waul had received at least fifty-nine physical therapy sessions, multiple knee braces, and numerous consultations with multiple orthopaedic surgeons.

### 4. January 2002 - May 2007

On January 12, 2002, Waul was still complaining of knee pain and another orthopaedic consult was requested.  Docket No. 167-4 at 28.[14]  On March 14, 2002, Dr. Rubinovich concluded that although Waul was "doing generally well at this point," there was still considerable weakness in his quadriceps and his ACL was moderately loose but stable due to the new brace.  Docket Nos. 161-13 at 10, 167-4 at 27.  Dr. Rubinovich emphasized the need to "get some more strengthening [and] . . . show[ed] him some things to do on his own if this is not possible through Physical Therapy."  Docket Nos. 161-13 at 10, 167-4 at 27; Rubinovich Decl. ¶ 12.  By April 16, it was being asked whether, despite, sixty-three sessions of physical therapy to that date, Waul had successfully been completing the independent exercise program as instructed.  Docket No. 167-7 at 35.

On July 22, 2002, Waul received a letter from defendant Van Buren, DOCS Regional

---

[14] From January to September 2002, there were at least four instances where Waul sought over-the-counter pain medication, two complaints of knee pain, one request for an orthopaedic consult, and at least three requests for examination for Waul's inadequate knee brace.  Docket No. 161, Ex. A. at 118-133.

Health Administrator, instructing Waul to follow the treatment plan that was outlined during his sixty-plus therapy sessions as independent exercise was now the recommended course of treatment.  Docket Nos. 161-11 at 8, 167-4 at 30-44; Van Buren Decl. (Docket No. 161-11) ¶¶ 7-13, 15.[15]

On April 12, 2004, Waul was transferred to Fishkill Correctional Facility ("Fishkill") and placed under the care of defendants Sotile, the Director of the Fishkill Health Services and a board certified surgeon, and Delessio, a physical therapist.  Sotile Decl. (Docket No. 161-8) ¶¶ 1, 9; Delessio Decl. ¶ 8 .   Waul was again approved for additional therapy sessions.  Docket No. 167-5 at 56.[16]

On or about June 14, 2004, Waul was again evaluated for physical therapy and was approved for eight additional therapy sessions.  Delessio Decl. ¶ 13; Defs. Mem. filed 7/21/2008.[17]  Waul was seen eight additional times with no new complaints of pain and engaged in exercises which included lower extremity stretching and strengthening and walking on a treadmill at various speeds and inclines.  Id.; Delessio Decl. ¶ 14.  In mid-July,

---

[15] From September 2002 until January 2004, Waul had at least six examinations for his knee brace, one seeking over-the-counter pain medication, one scheduling an orthopaedic consult, and nine instances of pain in his knees beginning in August of 2003. Docket No. 161, Ex. A. at 90-118.

[16] From the end of February to mid-June, 2004, Waul had three discussions regarding his knee brace, at least four complaints of pain in his knees, two requests to schedule orthopaedic consultations, at least one request for over-the-counter medication, at least one failure to show for an examination, and at least one request for x-rays. Docket No. 161 at 74-89.  In April 2004, Waul apparently first requested a medical permit to place his leg on a chair, which was granted.  Id. at 87.

[17] Waul's ambulatory health records indicate that physical therapy was recommenced in June 2004.  Docket No. 161, Ex. A at 75.  From June to December, Waul requested over-the-counter medication only seven times, complained of knee pain only five times, had examinations relating to various permits three times, sought the referral to, an orthopaedist, and did not attend an examination on three occasions.  Id. at 55-75.

14

Waul began refusing therapy sessions due to abdominal pain later diagnosed as a double hernia requiring surgical intervention.  Delessio Decl. ¶ 14.  On August 20, 2004, Waul received a letter from defendant Byrnes, DOCS Regional Health Services Administrator, confirming that in June, Waul was approved for eight more therapy sessions but that he had attended only six of the eight and refused the last two.  Docket Nos. 161-7 at 11, 167-5 at 59; Brynes Decl. ¶¶ 15-17.

On or about January 18, 2005, Waul complained to Sotile about not having an orthopaedic consultation, hernia intervention, or physical therapy referral.  Am. Compl. ¶ 69; Sotile Decl. ¶ 10.  Sotile determined that Waul was receiving proper care.  Sotile Decl. ¶¶ 12-13.[18]  On February 3, 2005, defendant Dr. Assefi first examined Waul and ordered an orthopaedic consult.  Assefi Decl. ¶ 13.[19]  In March 2005, Waul was evaluated by an orthopaedist who found swelling in his knees but good range of motion and mild, progressive, degenerative joint disease in his knees.  Docket No. 167-5 at 37.  Physiotherapy was recommended after Waul underwent his hernia surgery along with ice and an MRI.  Id.  On March 7, 2005, Waul received a letter from Byrnes informing Waul that Waul's surgical needs had been evaluated, a procedure would be conducted in the near future, and his orthopaedic needs had been appropriately met.  Docket Nos. 161-7 at 13, 167-5 at 63; Brynes Decl. ¶¶ 18-19.

In May 2005, Waul underwent surgery.  Defs. Mem. filed 7/21/2008.  Prior to surgery,

---

[18] Sotile concluded that despite Waul's claims that his knees, surrounding muscles, and ambulation were deteriorating, the objective medical evidence indicated that Waul was stable.  Sotile Decl. ¶¶ 21-22.

[19] Dr. Assefi noted that "[t]he treatment that is most effective after an ACL surgery is the 3-6 month period directly following the surgery."  Assefi Decl. ¶ 13.

an orthopaedist recommended three months of physiotherapy for Waul.[20]  Id.; Assefi Decl. ¶ 17.  Physiotherapy was then delayed first by the hernia surgery, then by a clerical error resulting in a four-month delay, and then by Waul's refusal.  Id. ¶¶ 18-23.  In the interim, Waul had another therapy evaluation in April 2006 but did not have regular therapy until June 2006 when he underwent eight sessions in two months.  Defs. Mem. filed 7/21/2008.  The sessions included the treadmill at varying speeds and inclines, stretching, and doing range of motion and Thera-Band exercises.  Id.  Waul received a few more months of sporadic treatment, and then underwent another seven therapy sessions from November to December utilizing the treadmill and bicycle and emphasizing strengthening, range of motion, and endurance exercises.  Id.; Assefi Aff. ¶ 24.[21]

On May 2, 2007, Waul underwent MRIs of both knees.  Docket No. 167-6 at 20-22.  The MRI of his left knee showed small joint swelling, mild degenerative osteoarthritis changes, and no meniscal tears.  Id. at 20.  The MRI of his right knee showed a re-tear of his meniscus, intact repair of his ACL, small to moderate joint swelling, and moderate degenerative osteoarthritis changes.  Id. at 21-22.  On May 20, 2007, Waul was examined by Dr. Schwartz for complaints of pain and difficulty walking.  Id. at 23.  Waul stated that he was unable to engage in physical therapy because he did not have sufficient room to

---

[20] From May 2005 to January 2007, Waul made at least eight complaints to obtain continued therapy, at least eight instances complaints of pain in his knee, three complaints about permits, one about an examination, and one about an orthopaedist.  Docket No. 161, Ex. A. at 32-54.

[21] By January 2007, physical therapy was helping Waul.  Docket No. 161, Ex. A at 10-31; Assefi Aff. ¶ 25, 30.  From January 2007 to January 2008, Waul complain of knee pain on at least eleven occasions, requested and received two orthopaedic consultations, and requested, and received a review of, an MRI.  Id.  Because the physical therapy was not working, Waul received Synvisc injections to his knees to alleviate his condition.  Assefi Aff. ¶¶ 29-30.

perform the exercises.  Id.  Waul was found to have full range of motion in his knees and Dr. Schwartz observed that without physical therapy, surgery would be futile.  Id.  Dr. Schwarz recommended physiotherapy.  Assefi Decl. ¶ 17.  Months later, Waul's knees still caused pain and Dr. Schwartz suggested arthroscopic surgery to remove damaged tissue from his knee where necessary.  Docket No. 167-6 at 24; Assefi Decl. ¶ 19.

### B. Compliance with Medical Permits

Defendant Bailey, a DOCS corrections officer, was stationed in the Fishkill recreation room on July 10, 2004 and responsible for ensuring that inmates complied with rules, one of which prohibited an inmate placing his feed on a chair in the recreation room without a medical permit.  Bailey Decl. (Docket No. 161-8) ¶¶ 3-7.  The rule served to maintain order and cleanliness.  Id.  ¶ 7.  On April 1, 2004, Waul was given a medical permit to straighten his left knee on a chair as needed.  Docket No. 167-5 at 53.  This permit was reissued on May 10, 2004 with the same instructions.  Docket No. 167-5 at 51, 57.  On July 10, 2004, Bailey refused to honor Waul's medical permit because it was vague.  Baily Decl. ¶¶ 8, 12; Am. Compl. ¶ 46; Riddick Aff. (Docket No. 167-6 at 11).  It was not until July 16, 2004 that the permit specifically indicated that Waul should be allowed to elevate both his legs on chairs while he was seated in the recreation room.  Docket No. 167-5 at 48.  Subsequent permits contained identical instructions.  Docket No. 167-5 at 43-48, 51.

Waul claims that Bailey also refused to honor his medical permits on at least twenty-six occasions between September 2004 and March 2005.  Am. Compl. ¶ 48; Bailey Decl. ¶ 9; Waul Dep. at 50.  Waul attempted to speak to defendant Corey, Bailey's supervisor, but to no avail.  Am. Compl. ¶ 47; Waul Dep. at 49-50.  Waul filed a grievance on April 4, 2005

pertaining to this problem.  Bailey Decl. ¶ 10; Docket No. 167-6 at 15.  On April 14, 2005, the Inmate Grievance Resolution Committee (IGRC)[22] determined that Waul was then in possession of a proper permit and that Bailey would be directed to honor it.  Docket No. 167-6 at 16.  Once Waul obtained the proper documentation, he was permitted to place his feet on the chairs in the recreation room.  Bailey Decl. ¶ 13.  Since the grievance was resolved, no further problems with either Bailey or Corey have occurred.  Waul Dep. at 50-51.

## II. Discussion

Waul alleges that defendants were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment by (1) failing to comply with Dr. Das' physical therapy protocol, (2) failing to provide quality physical therapy, and (3) failing to honor his medical permit.   Defendants seek judgment on all claims.[23]

### A. Legal Standard

A motion for summary judgment may be granted if there is no genuine issue as to

---

[22]DOCS maintains a grievance program for inmate, known as the Inmate Grievance Program (IGP), through which inmates may seek remedies for mistreatment or misconduct by prison staff.  The IGP is a three-step process that requires an inmate to: (1) file a grievance with the IGRC; (2) appeal to the superintendent within four working days of receiving the IGRC's written response, and (3) appeal to the CORC [Central Office Review Committee] ... within four working days of receipt of the superintendent's written response." Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir.2004) (internal citations omitted).

[23] Defendants' claim a lack of personal involvement by Van Buren, Cunningham, and Byrnes.  Given the disposition of the motions recommend herein on other grounds, this argument will not be further addressed.

any material fact if supported by affidavits or other suitable evidence and the moving party is entitled to judgment as a matter of law. The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Facts are material if they may affect the outcome of the case as determined by substantive law. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). All ambiguities are resolved and all reasonable inferences are drawn in favor of the non-moving party. Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

The party opposing the motion must set forth facts showing that there is a genuine issue for trial. The non-moving party must do more than merely show that there is some doubt or speculation as to the true nature of the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs. 22 F.3d 1219, 1223-24 (2d Cir. 1994); Graham v. Lewinski, 848 F.2d 342, 344 (2d Cir. 1988).

When, as here, a party seeks summary judgment against a pro se litigant, a court must afford the non-movant special solicitude. Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006); see also Sealed Plaintiff v. Sealed Defendant #1, 537 F.3d 185, 191 (2d Cir. 2008) ("On occasions too numerous to count, we have reminded district courts that 'when [a] plaintiff proceeds *pro se*, ... a court is obliged to construe his pleadings liberally.'" (citations omitted)). However, the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary

19

judgment; the requirement is that there be no genuine issue of material fact.  Anderson, 477
U.S. at 247-48.


### B. Eighth Amendment

The Eighth Amendment explicitly prohibits the infliction of "cruel and unusual
punishment."  U.S. Const. amend. VIII.  This includes the provision of medical care.
Hathaway v. Coughlin, 37 F.3d 63, 66 (2d Cir. 1994) (citations omitted).  A prisoner
advancing an Eighth Amendment claim for denial of medical care must allege and prove
deliberate indifference to a serious medical need.  Wilson v. Seiter, 501 U.S. 294, 297
(1991); Hathaway, 37 F.3d at 66.  More than negligence is required "but less than conduct
undertaken for the very purpose of causing harm."  Hathaway, 37 F.3d at 66.  The test for a
§ 1983 claim is twofold. First, the prisoner must show that there was a sufficiently serious
medical need.  Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998).  Second, the
prisoner must show that the prison official demonstrated deliberate indifference by having
knowledge of the risk and failing to take measures to avoid the harm.  Id.  "[P]rison officials
who actually knew of a substantial risk to inmate health or safety may be found free from
liability if they responded reasonably to the risk, even if the harm ultimately was not
averted."  Farmer v. Brennan, 511 U.S. 825, 844 (1994).

"'Because society does not expect that prisoners will have unqualified access to
healthcare,' a prisoner must first make [a] threshold showing of serious illness or injury" to
state a cognizable claim.  Smith v. Carpenter, 316 F.3d 178, 184 (2d Cir. 2003)(quoting
Hudson v. McMillian, 503 U.S. 1,9 (1992)).  Because there is no distinct litmus test, a
serious medical condition is determined by factors such as "(1) whether a reasonable doctor

or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) the existence of chronic and substantial pain."   Brock v. Wright, 315 F.3d 158, 162-63 (2d Cir. 2003)(citing Chance, 143 F.3d at 702).  The severity of the denial of care should also be judged within the context of the surrounding facts and circumstances of the case.  Smith, 316 F.3d at 185.

Deliberate indifference requires the prisoner "to prove that the prison official knew of and disregarded the prisoner's serious medical needs."   Chance, 143 F.3d at 702.  Thus, prison officials must be "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed."   Estelle v. Gamble, 429 U.S. 97, 104 (1976).  "Mere disagreement over proper treatment does not create a constitutional claim" as long as the treatment was adequate. Id. at 703.  Thus, "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists . . .  are not adequate grounds for a § 1983 claim."   Magee v. Childs, No. 04-CV-1089 (GLS/RFT), 2006 WL 681223, at *4 (N.D.N.Y. Feb. 27, 2006).  Furthermore, allegations of negligence or malpractice do not constitute deliberate indifference unless the malpractice involved culpable recklessness.  Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996).

Defendants do not dispute that Waul's knee injury and subsequent surgery constituted a serious medical need.  Defendants seek summary judgment on the ground that Waul has not demonstrated that any defendant were deliberately indifferent.

21

### 1. Physical Therapy

The record here reflects an ACL repair surgery, at least sixty physical therapy sessions, multiple provisions of pain medication, numerous orthopaedic consultations, diagnostic examinations, and an injection for Waul's knees.  Waul contends principally that the defendant physical therapists failed to (1) follow the protocol directed by Dr. Das and (2) provide quality therapy.

Even when viewing the evidence in the light most favorable to Waul, his first argument plainly constitutes at worst a disagreement over proper treatment between the orthopaedic surgeon and the physical therapists.  Multiple therapists and another surgeon all found that protocols such as Dr. Das' were intended as guidelines and that deference was afforded the therapist's judgment as to what exercises and techniques were proper for rehabilitation.  Koch Aff. ¶¶ 7-8; Delessio Decl. ¶ 10; Sottile Decl. ¶¶ 14, 19.  Dr. Das' protocol served at best as  a recommendation.  While Waul may have perceived Dr. Das' protocol as the "perfect" therapy plan, adherence to and creation of a "perfect treatment plan" of a caliber higher than that which the average reasonable person would expect to receive, is not constitutionally required.  See Salaam v. Adams, No. 03-CV-517 (LEK/GHL), 2006 WL 2827687, at *11 (N.D.N.Y. Sept. 29, 2006) (quoting Dean v. Coughlin, 804 F.2d 207, 215 (2d Cir. 1986)).

It appears that Dr. Das was accustomed to treating professional athletes at having elite facilities with unlimited resources.  Prisons lack such state-of-the-art facilities, but the Eighth Amendment does not mandate the provision of the best possible services.  The number and quality of physical therapy sessions Waul exceeded that received by most patients similarly situated.  Waul received multiple modalities of treatment, including electric

stimulation for his muscles, ice, a stationary bicycle, and instruction on stretches and strengthening exercises utilizing both resistance band weights.  Both in their number and content, then, the physical therapy sessions which Waul received exceeded what reasonably would be provided to a patient in his circumstances even if what was provided fell short of perfection.  Thus, even accepting their truth, Waul's contentions are insufficient to support a claim for medical indifference.

As to Waul's second contention, he has also failed to satisfy the subjective prong of the analysis.  First, the frequency of treatments Waul received cannot sustain a claim of deliberate indifference.  In the six months after surgery when physical therapy was most important to his recovery, Waul received at least twenty-eight physical therapy sessions before his discharge.  See Assefi Decl. ¶ 13; Koch Decl. ¶¶ 12, 16, 18.  Unlike other cases where delay and lapses might constitute deliberate indifference, Waul received more than adequate therapy which arguably exceeded that for an individual with private insurance.  See Anuszewski Aff. ¶ 14; Stevens v. Goord, 535 F. Supp. 2d, 373, 386 (S.D.N.Y. 2008) (holding that multiple one to two week lapses in the provision of therapy leading to a reduction to eight sessions in an eleven month period may constitute deliberate indifference).

The only arguable delay in treatment occurred after Waul was recommended for physiotherapy and the commencement was delayed by surgery, a clerical error, and Waul's own refusal to accept treatment.  Assefi Decl. ¶¶ 17-24.  At best, this delay constituted negligence on the part of the support staff.  Id. ¶¶ 19-22.  Considering all the circumstances, no evidence has been proffered of a malicious or deliberate intent to deprive Waul of therapy.  Any such negligence is insufficient to sustain an Eighth

23

Amendment claim.

Additionally, Waul's arguments that defendant physical therapists' decisions regarding their deviation from Dr. Das' treatment protocol and decision to implement various combinations of stretching, strengthening, and stimulation amount to attacks on "professional competence and not on [their] state of mind."  Reed v. McGee, No. 03-CV-756, 2004 WL 2980755, at *6 (W.D.N.Y. Dec. 22, 2004).  There is no support in the record, however, that any defendant's decisions were made with a malicious intent.  The record is uncontradicted that, as has been described in detail above, the decisions to discharge Waul from treatment were based on (1) his initial reports that his knee was improving, (2) the objective medical evidence showing an increase in strength, range of motion, and endurance despite his subsequent subjective complaints, and (3) Waul's competence and compliance with his independent exercise program.  Docket Nos. 153-6 at 28-29, 167-3 at 51; Koch Aff. ¶ 13.  Thus, no issue of fact has been raised that these decisions were motivated by well grounded professional judgments and not personal animus.

Despite Waul's stints in physical therapy during the Winter of 2000 throughout the Winter of 2001, by the beginning of 2002, Dr. Rubinovich found in Waul's consultation that further therapy sessions might not be necessary and placing the onus on Waul to continue with his rehabilitation independently.  Docket No. 161-13 at 10.  Nevertheless, Waul was again referred for eight sessions of physical therapy in the Summer of 2004 and multiple sessions concentrated in the Summer and Winter of 2006.  Assefi Decl. ¶¶ 17-24.  By January 2007, despite multiple attempts at physical therapy and physiotherapy, further therapy was deemed useful.  Id. ¶¶ 25, 30.  Notwithstanding defendants' efforts, therapy did improve Waul's condition and he was unable to return to regain his physical condition prior

to surgery.  While not uncommon,  it was unfortunate, but without more, the unfortunate outcome will not support a claim of malicious intent or a denial or deprivation of care.

Furthermore, Waul's contentions that the deprivation of Thera-Band and other equipment rendered his therapy sessions fruitless lacks support in the record.  First, Thera-Band constitutes a security concern because it could easily be used to harm or restrain others.  Because of its elasticity and recoil capacity, it could also jeopardize the safety of other inmates and staff.  "[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of . . . convicted prisoners . . . ."  Bell v. Wolfish, 441 U.S. 520, 546 (1979).  Prison officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security."  Id. at 547; see also Pell v. Procunier, 417 U.S. 817, 827 (1974) ("in the absence of substantial evidence in the record to indicate that the [prison] officials have exaggerated their response to these [security] considerations, courts should ordinarily defer to their expert judgment in such matters.").  Thus, the prohibition of Thera-Band in inmates' cells or use of Thera-Band without proper supervision was a legitimate safety concern given the potential for use as a weapon and to injure bystanders.  Deference must be properly accorded to each individual correctional facility's rules concerning the use of such items.

Second, as discussed above, simply because Waul was not provided with therapy with the equipment he deemed appropriate does not render the care inferior or inadequate.  The care must be reasonable and it was reasonable here as demonstrated by, among other things, Waul's subjectively perceived improvement and his objectively demonstrated

25

increased strength, stability, range of motion, and endurance.  Furthermore, Waul engaged in progressively longer stretches of time exercising, with more repetitions, and more weight. These indicate effective and appropriate treatment.

Accordingly, defendants' motions for summary judgment should be granted on this ground.


### 2. Compliance with Medical Permits

Waul also contends that defendants Bailey and Corey deliberately interfered with his medical treatment by failing to comply with his medical permits to rest his leg on a chair. The record indicates that while Bailey initially refused to comply with what Waul alleged was a valid medical permit, after the grievance was filed, an investigation conducted, and a new permit issued, there were no further issues between Waul and the corrections officers. Bailey Decl. ¶¶ 10, 13; Docket No. 167-6 at 15-16; Waul Dep. at 50-51.  Waul offers no evidence to support a claim that either Bailey or Corey acted deliberately or recklessly in disregard of Waul's need.  Further, there is no evidence that these defendants' actions caused any injury to Waul.  Thus, no evidence has been proffered of any deprivation of Waul's constitutional rights.

Accordingly, defendants' motion for summary judgment on this ground should be granted.


### C. Qualified Immunity

Defendants contend that they are entitled to qualified immunity on this motion to dismiss.  Qualified immunity generally protects governmental officials from civil liability

26

"insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982); Aiken v. Nixon, 236 F. Supp. 2d 211, 229-30 (N.D.N.Y. 2002) (McAvoy, J.), aff'd, 80 Fed.Appx. 146 (2d Cir. Nov. 10, 2003).  However, even if the constitutional privileges "are clearly established, a government actor may still be shielded by qualified immunity if it was objectively reasonable for the . . . official to believe that his [or her] acts did not violate those rights."  Smith v. City of Albany, No. 03-CV-1157, 2006 WL 839525 *16 (N.D.N.Y. Mar. 27, 2006) (quoting Kaminsky v. Rosenblum, 929 F.2d 922, 925 (2d Cir. 1991); Magnotti v. Kuntz, 918 F.2d 364, 367 (2d Cir. 1990) (internal citations omitted)).

A court must first determine whether, if plaintiff's allegations are accepted as true, there would be a constitutional violation.  Saucier v. Katz, 533 U.S. 194, 201 (2001).  Only if there is a constitutional violation does a court proceed to determine whether the constitutional rights of which a reasonable person would have known were clearly established at the time of the alleged violation. Aiken, 236 F. Supp. 2d at 230.  Here, the second prong of the inquiry need not be reached concerning any of Waul's claims because, for the reasons discussed above, Waul has failed to raise a question of fact as to the first prong of the inquiry.

Accordingly, in the alternative, defendants' motion on this ground should be granted.

### III.  Conclusion

For the reasons stated above, it is hereby **RECOMMENDED** that defendants' motions for summary judgment (Docket Nos. 153, 161) be **GRANTED** and that judgment be entered for all defendants on all claims.

27

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report.  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993); Small v. Secretary of HHS, 892 F.2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).


DATED:  March 16, 2009
      Albany, New York

_____
United States Magistrate Judge